J. S64001/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: B.E.C. & N.C.C., MINOR CHILDREN | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.J.C., | : : | |
| Appellant | : : | No. 872 MDA 2015 |

Appeal from the Decree, April 21, 2015,
in the Court of Common Pleas of Lycoming County
Orphans' Court Division at No. 6457

BEFORE: FORD ELLIOTT, P.J.E., WECHT AND FITZGERALD,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:     **FILED OCTOBER 26, 2015**

S.J.C. ("Mother") appeals from the decree granting the petition filed by D.C. ("Father") to involuntarily terminate her parental rights to their children, B.E.C. and N.C.C. ("the Children"), pursuant to Section 2511(a)(1) and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1) and (b), so that Father's wife, S.C. ("Stepmother"), may adopt the Children. We affirm.

Mother and Father were married in 2005. The Children were born in 2005 and 2007. The parties separated in the spring of 2007. Father has always maintained primary physical custody of the Children. On August 2, 2007, the parties entered into a custody stipulation that was made an order of court granting Mother periods of partial custody every other weekend. Mother's periods of custody were to be exercised at maternal grandmother's home. Mother moved to Florida in 2008. The Children continued to visit

_____

* Former Justice specially assigned to the Superior Court.

with their maternal grandmother until September of 2013 when Father stopped the visits.

Mother moved back to Pennsylvania on January 13, 2013. Mother did not contact the Children because she did not have a telephone. Father did not speak to Mother in 2013 or 2014. (Notes of testimony, 4/1/15 at 8-9.) According to Father, he received one or two texts from Mother in 2014. (*Id.* at 8.) Mother obtained a telephone in December of 2014. She called Father's home on January 16, 2015, and spoke to the Children. The last time she physically saw the Children was on August 19, 2014, at a Dollar General Store in Lycoming County. Mother did not speak to the Children at this time because Stepmother prevented contact.

Father and Stepmother began living together in September of 2010. They married on April 6, 2013. The petition to terminate Mother's parental rights was filed on January 2, 2015. A hearing was held on April 1, 2015. The decree terminating Mother's parental rights was entered on April 21, 2015. This timely appeal followed.

Mother raises two issues for our consideration:

> I. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT CLEAR AND CONVINCING EVIDENCE EXISTED TO SHOW THAT APPELLANT HAD A SETTLED PURPOSE TO RELINQUISH A PARENTAL CLAIM UNDER 23 PA.C.S.A. § 2511(A)(1) IN THAT [APPELLANT] WAS REBUFFED BY BOTH FATHER AND STEPMOTHER IN HER ATTEMPTS TO MAINTAIN CONTACT WITH THE CHILDREN AND PERFORM PARENTAL DUTIES?

> II. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT CLEAR AND CONVINCING EVIDENCE EXISTED TO SHOW THAT APPELLANT'S RIGHTS SHOULD BE TERMINATED UNDER 23 PA.C.S.A. § 2511(B), IN THAT THE DEVELOPMENTAL, PHYSICAL, AND EMOTIONAL NEEDS AND WELFARE OF THE CHILD ARE NOT BEST SERVED BY TERMINATING MOTHER'S PARENTAL RIGHTS?

Mother's brief at 4.

We review an appeal from the termination of parental rights in accordance with the following standard:

> In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *See* 23 Pa.C.S.A. § 2511. The burden is upon the petitioner "to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super. 2009). "[C]lear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of

the precise facts in issue." *Id.* (citation and quotation marks omitted). Further, the "trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004). If competent evidence supports the trial court's findings, "we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003).

Satisfaction of any one subsection of Section 2511(a), along with consideration of Section 2511(b), is sufficient for the involuntary termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). In this case, we will review the trial court's decision to terminate Mother's parental rights based upon Section 2511(a)(1) and (b), which state the following:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

We have explained this court's review of a challenge to the sufficiency of the evidence supporting the involuntary termination of a parent's rights pursuant to Section 2511(a)(1) as follows:

> To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.
>
> . . . .
>
> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (citations omitted).

> [T]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa.Super. 2010) (citation omitted); *see also In re Adoption of C.L.G.*, 956 A.2d 999, 1006 (Pa.Super. 2008) (*en banc*).

Further, regarding the definition of "parental duties," this court has stated as follows:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the

> parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004) (citations omitted); *see also In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012).

Instantly, the trial court did not find that Mother evidenced a settled purpose to relinquish her parental rights. (*See* trial court opinion, 6/2/15 at 2.) Instead, the trial court determined "Mother refused or failed to perform parental duties for a period in excess of six months prior to the filing of the petition." (*Id.*) Mother argues she performed parental duties during the relevant statutory timeframe, July 2, 2014 through January 2, 2015. Mother cites two examples of her performance of parental duties; she sent B.E.C. a birthday card in August and attempted to interact with the Children during a "chance encounter" at the Dollar Tree Store on August 19, 2014. (Mother's brief at 10.) Mother's examples fall short, as sending a birthday card and attempting to speak with her Children during a "chance encounter" are hardly the type of actions that show Mother was trying to perform her parental duties.

Turning to Mother's testimony, she testified that she could not call the Children in 2013 and 2014 because she did not have a telephone. (Notes of

testimony, 4/1/15 at 108-109.) However, when she did finally obtain a cell phone in December 2014, she waited three weeks before she called the Children. (*Id.* at 107.) Mother finally spoke with the Children on January 16, 2015, after Father filed the petition to terminate Mother's parental rights. In this day and age with cell phone usage everywhere, it defies logic that Mother was unable to borrow a cell phone from someone so that she could contact her Children or inquire as to their welfare. The trial court specifically found that Mother's failure to have a cell phone "does not alleviate her obligation to perform her parental duties." (Trial court opinion, 4/21/15 at 5.)

Our review of the record indicates that after leaving for Florida in 2008, Mother has never provided the Children with any basic needs, such as, food, clothing, or any form of financial support. (Notes of testimony, 4/1/15, 15-16, 103.) Mother does not know the Children's doctors, nor did she inquire about the Children's health between 2012 and the filing of the petition in January of 2015. (*Id.* at 103-104.) Mother has never attended a parent/teacher conference or asked how the Children were doing in school. (*Id.* at 112.) Mother admitted that even though the maternal grandmother was aware of how the Children were doing in school and that B.E.C. had a medical condition,[1] Mother never asked for more information, such as, B.E.C.'s doctor's name. (*Id.* at 113.) This testimony clearly established

---

[1] B.E.C. suffers from epilepsy. (*Id.* at 104.)

that Mother did not perform parental duties for the Children within the relevant time period.

Next, Mother argues the trial court failed to consider the obstructive behavior on the part of Father and Stepmother aimed at thwarting her ability to maintain a parental relationship with the Children. In **Adoption of M.S.**, 664 A.2d 1370, 1374 (Pa.Super. 1995), this court warned "that obstructive behavior on the part of the custodial parent aimed at thwarting the other parent's maintenance of a parental relationship will not be tolerated, and certainly will not provide a sound basis for the involuntary termination of parental rights." Here, as examples of Father's and Stepmother's obstructive behavior, Mother references Father's failure to respond to a text message she sent and Stepmother's refusal to allow Mother to speak to the Children at the Dollar General Store on August 19, 2014. (Mother's brief at 11.)

Regarding Mother's texting Father, she testified as follows:

Q.    So you would have text[ed] [Father] with a friend's cell phone in 2014?

[Mother]:  Correct.

Q.    Would you agree with me that it's conceivable that [Father] would not have recognized that phone number?

[Mother]:  Correct.

Q.    Is that the only time in 2014 that you text[ed] [Father] with the cell phone?

[Mother]: Correct.

Notes of testimony, 4/1/15 at 110.

Regarding Mother's claim that Stepmother refused to allow her to speak to the Children, Stepmother testified as follows:

> Q. And who was present at this -- at the Dollar Store that day?
>
> [Stepmother]: My mother, her aunt, Tammy, and I don't know who else was in the car, and all of my children.
>
> Q. Okay. [N.C.C.] and [B.E.C.]?
>
> A. Un-hum. Yes.
>
> Q. And how close was [Mother] to [B.E.C.] and [N.C.C.] that day?
>
> A. A couple car lengths away.
>
> Q. And did she see them?
>
> A. Yes.
>
> Q. And what was the nature of the conversation -- well, let me ask you this, how long was your conversation with [Mother] on that day?
>
> A. I'm going to say probably 15 minutes.
>
> Q. And what was the nature of the conversation that you had?
>
> A. I pretty much just, you know, wanted to let her know that [the Children] know that she's their real mom and we don't lie to them, you know. And when they can understand better then we will have a -- you know, it wouldn't be an issue.

Q.    What did she --

A.    But she wanted to talk about [Father]; and I kept --

Q.    What do you mean?

A.    What he did wrong in their marriage basically. And I kept bringing it back to [B.E.C.] and [N.C.C.].

Q.    How would you describe the tone or tenure [sic] of the conversation?

A.    Friendly.

Q.    And did Mother ask you about the Children?

A.    I don't believe so, no.

Q.    Did she ask to see them?

A.    No.

Q.    Well, what happened at the end of the meeting?

A.    We walked away.  I don't really remember exact words but -- we just walked away and got in our cars.

* * *

Q.    Did [Mother] lean in the car and say anything to the boys?

A.    No.  No.

Q.    Did you prevent [Mother] from going up to your car and seeing the boys?

A.    No.

*Id.* at 56-58.

The above instances hardly represent obstructive behavior on the part of Father and Stepmother, and the trial court specifically found that Mother's testimony regarding "roadblocks" was not credible. (Trial court opinion, 4/21/15 at 5.) Additionally, despite the August 2, 2007 court order awarding Mother partial physical custody, at no time did Mother seek to enforce that order. The trial court noted, "Mother's only interaction with her children has been at her convenience and has been minimal, at best." (**Id.**)

In this case, the record demonstrates the trial court heard Mother's testimony regarding her circumstances and concluded Mother failed to perform her parental duties for years. Mother's interest in her Children was sporadic at best; meanwhile, Stepmother assumed the role of the Children's mother. We conclude the evidence presented supports termination of Mother's parental rights pursuant to Section 2511(a)(1).

Next, Mother argues the trial court erred when it decided the termination of her parental rights best serves the needs and welfare of the Children. We begin by observing that once the statutory requirement for involuntary termination of parental rights has been established under Section 2511(a), the court must consider whether the child's needs and welfare will be met by termination pursuant to Section 2511(b). **In re D.W.**, 856 A.2d 1231, 1234 (Pa.Super. 2004). Pursuant to Section 2511(b), the trial court must engage in an analysis of the best interests of the child by taking into primary consideration the developmental, physical, and

emotional needs of the child. ***In re Adoption of R.J.S.***, ***supra*** at 508. The trial court must consider "intangibles such as love, comfort, security, and stability." ***In re C.P.***, 901 A.2d 516, 520 (Pa.Super. 2006). To this end, this court has indicated that the trial court "must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." ***In re C.L.G.***, 956 A.2d 999, 1009 (Pa.Super. 2008) (***en banc***).

In support of her claim that the termination of her parental rights would not serve the Children's developmental, physical, and emotional needs and welfare, Mother cites a Christmas visit in 2011, a visit in 2012, and her telephone call to the Children on January 15, 2015. (Mother's brief at 13.) The maternal grandmother testified that Mother and the Children "got along great." (Notes of testimony, 4/1/15 at 126.) She further testified that the Children were happy to see Mother and showed affection towards her. (***Id.***)

The trial court determined the Children had no bond with Mother and addressed Mother's relationship with her children as follows:

> Mother does not have a bond with the children. She has shown almost no interest in the lives or welfare of her children for a period in excess of two (2) years. The only mother that the children know is Step-Mother. Step-Mother has performed a large portion of the parental duties. The children do not ask about Mother. Mother did not attempt to contact either child in 2013 or 2014. There was no testimony from any party that there was a bond demonstrated between the children and Mother at any time. There was no testimony that a bond exists between children and Mother after Mother's years of

absence and disinterest. Further, termination of her rights would not destroy an existing necessary and beneficial relationship as there currently exists no relationship between Mother and the children.

Trial court opinion, 4/21/15 at 7.

Clearly, the Children, who are now ten and eight years old, know they have a Mother who has not had any type of presence in their daily lives. While Mother may have some type of casual relationship with the Children, it is not a parental bond, as Mother has not demonstrated any actual commitment to parenting.

Accordingly, we discern no abuse of discretion by the trial court terminating Mother's parental rights to the Children.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/26/2015

- 14 -