664 A.2d 1370

## ADOPTION OF M.S., A Minor.

### Appeal of Henry and Lynn WAGNER.

Superior Court of Pennsylvania.

Argued March 14, 1995.

Filed Sept. 6, 1995.

178

Arthur L. Jenkins, Jr., Norristown, for appellants.

Kate M. Kelly, Lansdale, for Annette Sheive, participating party.

Sinikka Lawless, Amicus Curiae.

Before HUDOCK, SAYLOR and HESTER, JJ.

HESTER, Judge:

This appeal is from the denial of a petition filed pursuant to 23 Pa.C.S. § 2511(a)(1) and (2) for involuntary termination of parental rights regarding the minor child, Michelle S. Upon thorough review of the record, we find that the orphan's court's determination is well-supported by the evidence and in light of the appropriate standard of review, we affirm.

 Annette S., appellee, the natural mother of Michelle, married Cedric S. in Georgia on November 22, 1987. Notes of testimony ("N.T."), 8/18/94,[1] at 213. Cedric cannot be located.

1. We note that counsel for appellants failed to supply the notes of testimony from August 18, 1994, thereby necessitating our order of July 11, 1995, directing counsel to supplement the record. We remind counsel:

that the Superior Court may only consider documents properly incorporated within the certified record. *Gemini Equipment v. Pennsy*

180

Their child, Michelle, was born August 26, 1988. Appellants, Henry and Lynn Wagner, husband and wife, are Annette's brother and sister-in-law. They have been married for eight years and have no children of their own. *Id.* at 100. At the time of the hearing, Henry was thirty-two, Lynn was thirty-seven, and Annette was thirty-eight years old. *Id.* at 85, 100; trial court opinion, 10/14/94, at 2.

Annette and Michelle resided in the condominium of Annette and Henry's mother in early 1989. Their mother, ill with cancer, died in March, 1989. N.T., 8/18/94, at 38. Following their mother's death, Henry visited Annette at the condominium and told her that the condominium was to be sold and she would have to find another place to live. At that time, Annette, who holds a master's degree in geology, was acting irrationally and was extremely distraught. Both Henry and a real estate agent he had retained testified that the conditions in the condominium were appalling, with cat urine and dirty diapers throughout. Soon after this confrontation, Annette disappeared with Michelle. Henry filed a missing persons report, and Annette was located in California. *Id.* at 43, 45. Annette and Michelle returned to Pennsylvania to find

*Supply,* 407 Pa.Super. 404, 412 n. 5, 595 A.2d 1211, 1215 n. 5 (1991). The defect in the case *sub judice* is not cured by the fact that appellant has provided a copy of the trial transcript in the reproduced record. Paper may not be made part of the certified record simply by reproducing it. *Id.*

The certified record consists of the original papers and exhibits filed in the lower court, the transcript of proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the lower court. *See* Pa.R.A.P., Rule 1921, 42 Pa.C.S.A. (composition of record on appeal); *Frank v. Frank,* 402 Pa.Super. 458, 463 n. 5, 587 A.2d 340, 342–43 n. 5 (1991). "It is the obligation of the appellant to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal." *Fiore v. Oakwood Plaza Shopping Center, Inc.,* 401 Pa.Super. 446, 460–61, 585 A.2d 1012, 1019 (1991). "For purposes of appellate review, what is not of record does not exist." *Frank v. Frank, supra.*

*Floyd v. Philadelphia Elec. Co.,* 429 Pa.Super. 460, 462–63, 632 A.2d 1314, 1315 (1993). While counsel eventually complied with our July 11, 1995 order, we note with consternation that he did so more than three weeks beyond the time directed, thereby delaying resolution of this case unnecessarily.

that they were locked out of the condominium and their belongings had been removed. After visiting Annette at a local motel, Henry commenced proceedings to commit Annette involuntarily to Norristown State Hospital and contemporaneously filed a petition seeking custody of Michelle. *Id.* at 50–51. Annette was committed but also was discharged approximately three days later.

A hearing was held on June 6, 1989, following which appellants retained custody of Michelle. Children and Youth Services of Montgomery County ("CYS") was ordered to investigate the situation and provide supervised visitation between Annette and Michelle. Annette exercised visitation until May, 1990, when CYS terminated all visitation between Annette and Michelle. There is no order of court directing such action.

In June, 1990, Annette filed a petition to modify custody, but her mental stability apparently declined, and she voluntarily entered Norristown State Hospital in October, 1990, where she resided for five months. *Id.* at 241; N.T., 10/5/94, at 142. In the meantime, her custody petition proceeded to a hearing in January, 1991. Annette was in Norristown Hospital at the time, and her attorney did not receive prior notice of the hearing and failed to appear. No one explained to the court that Annette was unavailable; thus, the hearing proceeded *ex parte,* and the trial court awarded physical and legal custody to appellants. No appeal was filed from this order.

In April, 1991, upon discharge from Norristown State Hospital, Annette came under the care of Hedwig House, a psycho-social day program which operates in conjunction with the local mental health/mental retardation ("MH/MR") services. N.T., 10/5/94, at 148. During this supervision at Hedwig House, Annette obtained employment and her own living quarters. *Id.* at 133. Her involvement with Hedwig House terminated in April, 1994, roughly the time MH/MR terminated its services. *Id.* at 142; N.T., 8/18/94, at 168. Annette has been taking Haldol since she was in Norristown State Hospital in 1991. N.T., 8/18/94, at 242. She testified that the drug has allowed her "to lead a rather normal life." *Id.*

Annette filed another petition to modify custody in June, 1991. In December, 1991, the common pleas court granted appellants' preliminary objections and dismissed Annette's petition. The December 27, 1991 order further provided that Annette could file a complaint for custody within twenty days of that date. No such complaint was filed.

In February, 1994, Annette obtained her present counsel. She filed a complaint for custody on March 31, 1994. Appellants filed the instant petition to involuntarily terminate Annette's parental rights four days later. Hearings were held on August 18 and October 5, 1994. On October 14, 1994, the Honorable Stanley R. Ott denied appellants' petition to terminate Annette's parental rights to Michelle. Exceptions were filed, argued, and denied, and the court filed its final decree on November 29, 1994. This appeal followed.

Appellants contend the orphan's court abused its discretion in denying their petition to terminate Annette's parental rights to Michelle. The Pennsylvania Supreme Court recently reiterated the standard of review in cases involving the involuntary termination of parental rights.

In cases of involuntary termination of parental rights, the standard of appellate review is limited to the determination of whether the decree of the Orphan's Court is supported by competent evidence. *In re E.M. a/k/a E.W.C. et al.*, 533 Pa. 114, [115] 620 A.2d 481 (1993), quoting, *Matter of Adoption of G.T.M.*, 506 Pa. 44, 46, 483 A.2d 1355, 1356 (1984); *In re Adoption of B.D.S.*, 494 Pa. 171, 177, 431 A.2d 203, 206 (1981). Where the hearing court's findings are supported by competent evidence of record, "we must affirm the hearing court even though the record could support an opposite result." *In re Adoption of B.D.S.*, 494 Pa. 171, 177, 431 A.2d 203, 206 (1981), quoting, *Matter of Kapcsos*, 468 Pa. 50, 54, 360 A.2d 174, 176 (1976).

. . . .

In a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by "clear and convincing" evidence the existence of

grounds for doing so. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re T.R.*, 502 Pa. 165, 465 A.2d 642 (1983). The standard of "clear and convincing" evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. *Matter of Sylvester*, 521 Pa. 300, 304, 555 A.2d 1202, 1203–04 (1989).

*In re Adoption of Atencio*, 539 Pa. 161, 165, 650 A.2d 1064, 1066 (1994).

While the petition to terminate parental rights was filed pursuant to 23 Pa.C.S. § 2511(a)(1) and (2), appellants confine their argument on appeal to subsection (1). That section provides:

**§ 2511. Grounds for involuntary termination**

(a) *General rule.*—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

The statute thus indicates that in order to terminate parental rights involuntarily, there must be a showing of both a six-month period of estrangement and either a settled purpose or intent to relinquish a parental claim or a failure to perform parental duties.

 To establish a settled purpose to relinquish a parental claim, appellants must show that Annette made a deliberate decision to terminate the parent-child relationship throughout the six-month period. *Matter of Adoption of Barnett*, 304 Pa.Super. 514, 450 A.2d 1356 (1982). Failure to have contact with the child for six months will not automatically forfeit a parent's rights. *In re Adoption of Hamilton*, 379 Pa.Super. 274, 549 A.2d 1291 (1988). Moreover, this court consistently has refused to apply the statutory six-month time frame mechanically. *In re E.S.M.*, 424 Pa.Super. 296, 622

A.2d 388 (1993). Instead, the court must consider the individual circumstances of each case. *Id.*

■ It is undisputed that Annette has not seen Michelle since CYS terminated her visits in May, 1990. Appellants testified at trial that Annette made no attempt to see her daughter since that time, and sent no cards, letters, or packages. Annette testified to the contrary, stating that she made substantial efforts to maintain contact with Michelle but that she was thwarted by appellants' conduct. In resolving this case, the orphan's court stated the following:

The most helpful evidence in resolving the factual dispute was [Annette's] Exhibit 3, a package containing a doll purchased by [Annette] for Michelle's third birthday and sent to her via UPS in September 1991. The package was returned with a notation that delivery had been refused, stating "does not want". [Appellants] insist that to the extent the package was sent at all, it was returned because of an improper zip code. We don't think so. Clearly the designation on the UPS return slip reflects that the receiver refused the package and did not want it. Although efforts made by [Annette] to communicate with her daughter in August/September 1991 are outside the six month period framed by [appellants'] petition, their refusal to accept the package is, we believe, indicative of their attitude throughout. We also attribute great weight to the testimony of [Annette's and Henry's] sister Sylvia, who corroborated the many efforts her sister made to send cards and gifts to Michelle. For these and other reasons, we have resolved the credibility issue in favor of [Annette] and we determine that she did consistently, within her means, engage in continuous and repeated attempts to reestablish parental contact with her daughter.

Trial court opinion, 10/14/94, at 7–8.

■ On appeal, appellants focus upon the fact that Annette did not file a complaint for custody within the twenty-day period identified in the December 27, 1991 order wherein the common pleas court sustained appellants' preliminary objec-

tions and dismissed Annette's petition to modify custody. The record is very clear as to why Annette failed to do so. It is uncontradicted that Annette was an in-patient at Norristown Hospital in December, 1991. In fact, she remained there until April, 1992. Throughout the following two years, Annette clearly strove to control her mental illness and to establish a living situation wherein her child could thrive. Moreover, "[w]here a parent makes *reasonable* attempts to overcome obstacles created by the party seeking to terminate parental right, 'a mere showing that the parent could conceivably have pursued legal action more promptly cannot justify termination of parental rights.'" *In re Adoption of C.M.W.*, 412 Pa.Super. 360, 366, 603 A.2d 622, 625 (1992), quoting *In re J.G.J.*, 367 Pa.Super. 425, 434, 532 A.2d 1218, 1223 (1987).

The record establishes that when Annette was placed on the drug Haldol, she began to function without significant impairment. N.T., 8/18/94, at 242–43; N.T., 10/5/94, at 153–55. She progressed from an in-patient in a mental institution for five months to a transitional living residence, turned a volunteer position in a library into a full-time paid position, and found a home to share with a room-mate in a neighborhood with many children. N.T., 8/18/94, at 209, 241; N.T., 10/5/94, at 124–27, 130.

Annette testified that she sent cards and letters to her daughter once a month and sent her gifts at holidays. Appellants scoff at Annette's testimony in this regard, noting that "it is apparent from the record that the minor child could not read." Appellants' brief at 14. However, it is clear to us, as it was to the trial court, that Annette was utilizing the means at her disposal to maintain the relationship with her child. Appellants' denials aside, the record supports the determination that Annette sent cards and letters to Michelle that were cast aside and packages that were refused or discarded. Annette was relegated to sending Michelle gifts via her sister, Sylvia, to ensure that appellants would give them to the child. N.T., 10/5/94, at 162. She was unable to telephone Michelle after appellants changed their telephone to an unlisted number. Annette clearly stated that her reluctance to "show up" at

appellants' doorstep was caused by her fear that Henry would seek another involuntary commitment coupled with her belief that appellants had sought a protection from abuse order against her. Henry admitted to seeking a PFA order, however there is no such order in the record. N.T., 8/18/94, at 92.

Finally, like the trial court, we find *In re E.S.M.*, 424 Pa.Super. 296, 622 A.2d 388 (1993), to be distinguishable from the instant case. In that case, we determined that the natural father personally made only a cursory effort to assume his parental position, i.e., one telephone call. Clearly, the obstacles placed in Annette's path were significant and ongoing, and we believe, as did the trial court, that she exhibited reasonable firmness in attempting to overcome both her mental illness and appellants' obstructive behavior.

We are reminded of words of the Pennsylvania Supreme Court nearly fifteen years ago and find that they are, unfortunately, applicable today.

> [Father's] testimony, believed by the Orphan's Court, demonstrated a design by appellant and her husband to deter appellee from the performance of his parental duties. The increasing frequency of cases similar to the present one convinces us of the need for a stern warning that obstructive behavior on the part of the custodial parent aimed at thwarting the other parent's maintenance of a parental relationship will not be tolerated, and certainly will not provide a sound basis for the involuntary termination of parental rights.

*In re Adoption of B.D.S.*, 494 Pa. 171, 179, 431 A.2d 203, 207 (1981) (overruled in part on other grounds by *In re Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883 (1986)).

Decree affirmed.