J-S52044-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF J.S.S. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.A.S., BIOLOGICAL MOTHER | No. 625 WDA 2015 |

Appeal from the Order of March 11, 2015
In the Court of Common Pleas of Cambria County
Orphans' Court at No.: 2014-0750-IVT

BEFORE:  SHOGAN, J., OLSON, J., and WECHT, J.

MEMORANDUM BY WECHT, J.:                    **FILED AUGUST 28, 2015**

C.A.S. ("Mother") appeals the March 11, 2015 order that terminated her parental rights to J.S.S. ("Child"), born in October 2008.  After careful review, we must conclude that the trial court abused its discretion, and consequently, we vacate the order.

On August 5, 2014, J.S. ("Grandmother") and P.A.S. ("Grandfather")[1] (collectively "Grandparents") filed petitions to involuntarily terminate Mother's and D.M.'s ("Father") parental rights to Child.  Grandmother and Grandfather sought to adopt Child.

On October 17, 2014, the trial court held a hearing on the petitions. The hearing testimony established the following summary of the facts disclosed at the hearing.

_____

[1]     Grandfather is Mother's stepfather and has no biological relationship to Child.  Notes of Testimony ("N.T."), 10/17/2014, at 7.

After Child was born, she lived with Mother and Father in an apartment with Mother's sister. Notes of Testimony ("N.T."), 10/17/2014, at 14. Mother worked at a care center. Grandmother would care for Child two or three nights per week while Mother was working. *Id.* at 15. Mother and Child moved in with Mother's then-boyfriend when Child was about two years old. *Id.* at 13, 16. Grandmother continued to care for Child while Mother worked, approximately three or four nights per week. *Id.* at 16.

Starting in February 2014, Child lived with Grandparents full-time. *Id.* at 13, 16. Mother asked to move into Grandparents' house with Child because Mother was leaving her then-boyfriend. *Id.* at 42. However, Mother only stayed at Grandparents' house a few overnights in February and March. *Id.* at 16. Mother admitted that she was rarely in the home overnight because she worked overnight hours or she worked until midnight and stayed at a friend's house who lived closer to Mother's work. *Id.* at 87-88. Mother cared for Child while Grandmother was at work from February 2014 until June or July of 2014. *Id.* at 44. When Mother was at Grandmother's during the day, she cared for Child, including feeding, bathing, and playing with Child. *Id.* at 88-89. Throughout February and March, Mother saw Child approximately two or three other times per week in addition to those times Grandmother was working. *Id.* at 43, 88. Sometimes, Child would spend the night at Mother's house. *Id.* at 88-89. However, when Grandmother said that she did not want Child to spend the night with Mother, the overnights stopped. *Id.* at 94.

In June or July 2014, Child told Mother that Grandmother had hired a babysitter for when Grandmother worked. At the same time, Grandmother stopped calling to inform Mother of Grandmother's work schedule. Grandmother never expressed any concerns to Mother about her caring for Child, nor did she tell Mother about the babysitter. *Id.* at 90. After Grandmother hired a babysitter to watch Child while Grandmother worked, Mother texted and called Child. *Id.* at 47. At that time, Grandmother believed Mother no longer felt welcome in Grandmother's home. *Id.* Mother would occasionally stop to see Child, but said she did not feel welcome. *Id.* at 91.

Mother last saw Child in August 2014. *Id.* at 17. On that day, Child ran to Mother and jumped into her arms. *Id.* at 65. However, Grandmother asked Mother to leave because Mother's former boyfriend was with her. *Id.* at 51. Mother said that Grandmother told her to get out, but did not say why. *Id.* at 92.

Grandmother asserted that she routinely took Child to doctor's appointments, in part because of Mother's work schedule. *Id.* at 17. Mother stated that she also took Child to the doctor. *Id.* at 106. Mother started Child in dance classes and Grandmother had continued that. *Id.* at 23-24. Mother attended dance recitals and Child's church plays. *Id.* at 24-25. Grandmother, Mother, and Father never entered into a formal custody arrangement, nor was there a custody order involving Grandmother. *Id.* at

J-S52044-15

18. However, Mother and Father had a custody order that granted Mother primary custody. *Id.* at 54.

After Grandmother filed the petition to terminate Mother's parental rights, Mother tried to see Child on a weekly basis. *Id.* at 19. Mother called Child on her birthday, approximately a week before the hearing, but did not send a card or gift. *Id.* at 20-21. Mother did not go to Child's party because Grandmother did not invite Mother to the party. Child informed Mother of the party when Mother called. *Id.* at 52-53. Mother has called and texted Child regularly since August 2014. *Id.* at 103. Grandmother often does not answer when Mother calls. Grandmother has not kept Mother informed about Child's school events or illnesses. *Id.* at 142.

Grandmother did not believe that Mother acted as a parent to Child. *Id.* at 34. Grandmother asserted that there was no longer a bond between Mother and Child as of February 2014. *Id.* at 64. Mother disagreed, stating that Child runs to Mother when Child sees her, gives her hugs, and tells Mother that she loves her. *Id.* at 105.

Mother admitted that she is a recovering drug addict. Mother had been clean for three years until she had a relapse in July 2013. In late February 2014, she started back at a methadone clinic and had been clean for approximately three months as of the hearing. *Id.* at 99. Mother testified that she could care for Child full-time because, as of the hearing, she had a stable home on her own and was seeing a counselor regularly. *Id.* at 100. Mother moved Child into Grandparents' home so that Child

- 4 -

would have stability while Mother sought help with her drug relapse. *Id.* at 101. Mother explained that she did not try to obtain physical custody of Child sooner because Mother wanted to ensure that she had a stable home first. *Id.* at 108.

Grandparents, Mother, and the guardian ad litem ("GAL") for the child each filed a memorandum. The GAL supported termination of Father's parental rights, but opposed the termination of Mother's parental rights. On March 11, 2015, the trial court issued an opinion and order terminating both Mother's and Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).[2]

On April 9, 2015, Mother filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On April 30, 2015, the trial court issued a statement pursuant to Pa.R.A.P. 1925(a), stating that the court was relying upon the March 11, 2015 opinion and order.

Mother raises one issue for our review:

Whether the lower court abused its discretion or committed an error of law when it involuntarily terminated the rights of [Mother] to [Child] under 23 Pa.C.S.A. § 2511(a)(1), where the Petition to Involuntarily Terminate Rights was filed with the lower court on August 5, 2014, when [Mother] continued to have substantial contact, exercise parental duties and provide for [Child's] essential needs up until at least June or July 2014?

_____

[2] Father has not appealed the termination of his parental rights.

Mother's Brief at 2.

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We "will examine the record closely in termination cases to determine whether the evidence supports a termination and will reverse where the evidence fails to support a trial court's decree and/or where the trial court has failed to give adequate consideration to the effect of such a decree upon the welfare of the child or children." *In re Bowman*, 647 A.2d 217, 219 (Pa. Super. 1994).

It is well-settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by clear and convincing evidence, which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004).

The trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511 which states, in pertinent part, as follows:

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

* * *

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

Termination is a two-step process; a trial court first must determine if the grounds under subsection (a) are met, and then it must consider subsection (b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). The focus in terminating parental rights under section 2511(a) is upon the parent, while section 2511(b) focuses upon the child.[3] *Id.* at 1008.

With regard to subsection (a)(1):

_____

[3] Here, Mother has only challenged the trial court's conclusions as to subsection (a)(1) and that is the focus of our memorandum.

- 7 -

The statute thus indicates that in order to terminate parental rights involuntarily, there must be a showing of both a six-month period of estrangement and either a settled purpose or intent to relinquish a parental claim or a failure to perform parental duties.

To establish a settled purpose to relinquish a parental claim, appellants must show that [the parent] made a deliberate decision to terminate the parent-child relationship throughout the six-month period. Failure to have contact with the child for six months will not automatically forfeit a parent's rights. Moreover, this court consistently has refused to apply the statutory six-month time frame mechanically. Instead, the court must consider the individual circumstances of each case.

*Adoption of M.S.*, 664 A.2d 1370, 1373 (Pa. Super. 1995) (citations omitted).

Here, the trial court did not find that Mother evidenced a settled purpose to relinquish a parental claim. Nor could it have so found. The evidence indicated that Mother was Child's primary caregiver until February 2014. After that Child lived primarily with Grandparents, but Mother kept in weekly contact from February until June or July of 2014. Even after that, when Mother no longer felt welcome to see Child, Mother called and texted Child. Mother never evidenced a settled purpose to relinquish her parental claim to Child.

Instead, the trial court relied upon its finding that Mother had failed to perform parental duties, and characterized Mother's relationship with Child as one of a playmate or friend, rather than a parent. We have defined parental duties as follows:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A

- 8 -

child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In re Z.P.*, 994 A.2d 1108, 1118-19 (Pa. Super. 2010). We have recognized that:

It is incumbent upon a parent when separated from his child to maintain communication and association with the child. This requires an affirmative demonstration of parental devotion, imposing upon the parent the duty to exert himself, to take and maintain a place of importance in the child's life.

*In re G.P.-R.*, 851 A.2d 967, 976 (Pa. Super. 2004). Additionally,

[A]lthough a parent may fulfill his or her parental duties and provide for the child by making suitable arrangements for the child's temporary care or by allowing others to provide essential parental services during a period of crisis, extended relegation of the child to the care of others as a result of parental incapacity is relevant . . . .

*In re Adoption of Sabrina*, 472 A.2d 624, 627 (Pa. Super. 1984).

It is undisputed that, from Child's birth until February 2014, Mother was Child's primary caretaker, although Mother received substantial assistance from Grandmother while Mother worked. It is also undisputed that, after February 2014, Child resided primarily with Grandparents.

However, the record does not support the conclusion that Mother failed to perform parental duties during this period. Mother saw Child several times each week and cared for Child during that time. Mother fed and bathed Child, took Child on outings, and played with Child. Mother, at times, had Child solely in her care overnight. Mother was not solely or even primarily performing parental duties for Child, but she did not fail to perform those duties in the six months preceding the filing of the petition.

The record provides evidence that Mother took more than a passive interest in Child. Mother demonstrated a "continuing interest in the child and a genuine effort to maintain communication and association with the child." **See Z.P.**, *supra*. Even when Mother no longer felt welcome at Grandparents' home, she called and texted Child. Mother made efforts to maintain a place in Child's life. The record demonstrates that Mother "fulfill[ed her] parental duties and provide[d] for the child by making suitable arrangements for the child's temporary care or by allowing others to provide essential parental services during a period of crisis," namely her drug relapse. **See Sabrina**, *supra*. This is not a case in which Mother left Child with Grandmother for an extended period of time or abandoned Child with no contact.[4]

_____

[4]  Child's GAL filed a brief in support of Mother's appeal. Notably, the GAL provided the following argument:

*(Footnote Continued Next Page)*

On this record, Grandparents did not meet their burden to demonstrate by clear and convincing evidence that Mother failed to perform parental duties. The trial court erred in so finding. Therefore, we vacate the order.

The trial court has entered a temporary custody order on October 17, 2014 that remains in effect. Either Mother or Grandparents may seek modification of that order.

Order vacated. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/28/2015

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯

At the time of the hearing in October of 2014, [Mother] was drug free, had a residence and was seeking employment. She testified she wants her child back in her care and never abandoned her child, instead she placed her in the care and custody of her loving [Grandparents], until [Mother] could correct her obstacles. Even [Grandmother] testified that [Mother] will always have a role in [Child's] life. . . . At best, this should be a custody case, certainly not an adoption or termination case.

GAL's Brief at 3.