J-S32018-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.M.P., JR., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.M.P., SR., FATHER | : | No. 846 EDA 2020 |

Appeal from the Decree Entered February 13, 2020
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s):  No. 2019-A0077

BEFORE:   KUNSELMAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY KING, J.:                    **FILED AUGUST 26, 2020**

Appellant, A.M.P., Sr. ("Father"), appeals from the decree entered in the Montgomery County Court of Common Pleas, Orphans' Court Division, granting the petition of the prospective adoptive parents, E.A.C. and J.A.C. ("Appellees"), for involuntary termination of Father's parental rights to his minor child, A.M.P., Jr. ("Child").[1]  We affirm.

The relevant facts and procedural history of this case are as follows. Child was born in January 2016.  At the time, Mother was seventeen years old.  Father was incarcerated in March 2016, and Mother could not care for Child on her own.  M.R. ("Maternal Grandmother") subsequently assumed care of Child.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] B.L.P. ("Mother") voluntarily relinquished her parental rights and consented to adoption.  On February 13, 2020, the court entered a final decree confirming Mother's consent to relinquishment of her parental rights.  Mother is not a party to the current appeal.

Thereafter, Mother determined that Appellees should care for Child:

> Custody proceedings in this matter began on March 18, 2016, when the child was only two months old, at which time [Appellees] filed an emergency petition for custody…. In it, they stated that [Mother,] who was 17 years old when the child was born, could not take care of him, wanted to put him up for adoption, and entrusted him to [Appellees]. Notice of the emergency petition for custody was given to both [Mother] and [Father,] who was incarcerated at the time the petition was filed. The emergency petition for custody was scheduled for a custody conciliation meeting on April 4, 2016. [Mother] did not appear and [Father] participated by telephone. Thereafter, the [court] issued an order dated April 5, 2016, granting legal and physical custody to [Appellees], giving [Mother] 60 days to file an application to revisit the petition, and giving [Father] 60 days following his release from prison, to file an application to revisit the order. If neither filed an application, the emergency custody order would become a final order. Neither [Mother] nor [Father] filed an application to revisit the custody order. [Father] was released from prison on March 7, 2018, and therefore the custody order became a final order on May 6, 2018.
>
> When the child was over three years old, [Father] filed a petition to modify the custody order on May 3, 2019, nearly a year and two months following his release from prison. In response to this filing, [Appellees] filed a motion to stay in the family division which was granted by the [court]….

(Trial Court Opinion, filed February 13, 2020, at 1-2) (internal citations omitted).

On May 8, 2019, Appellees filed a petition for adoption and a petition for involuntary termination of Father's parental rights. The court conducted termination hearings on September 27, 2019 and November 13, 2019. On February 13, 2020, the court entered a final decree involuntarily terminating Father's parental rights. The court determined Father failed to provide

financial support or maintain contact with Child while in prison and after his release. Further, Appellees cared for Child throughout his life, and Father did not have a bond with Child. On March 5, 2020, Father timely filed a notice of appeal and concise statement of errors complained of on appeal.

Father raises one issue for our review:

> Whether the trial court abused its discretion in granting petition to terminate parental rights of Father pursuant to 23 Pa.C.S.A. § 2511(a)(1), by finding that there was a failure or refusal of Father to perform parental duties.

(Father's Brief at 11).

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of

- 3 -

witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

Appellees filed a petition for the involuntary termination of Father's parental rights on the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

- 4 -

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117.

On appeal, Father alleges he tried to see Child during the six months prior to the filing of the termination petition, but Appellees prevented him from visiting. Father insists Appellees' actions obstructed his exercise of parental rights. Further, Father argues he has continually demonstrated an interest in parenting, despite the obstacles created by Appellees. Father relies on this Court's decision in *Adoption of M.S.*, 664 A.2d 1370 (Pa.Super. 1995), for the proposition that we will reverse a termination decree where a parent has attempted to overcome obstacles to the exercise of their parental rights. Father insists his case is factually analogous to *Adoption of M.S.*, noting his attempts to contact Child prove his intent to serve as a parent. Father concludes the court abused its discretion in terminating his parental rights

pursuant to Section 2511(a)(1). We disagree.

"A court may terminate parental rights under subsection 2511(a)(1) when the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least six months prior to the filing of the termination petition." *In re I.J., supra* at 10.

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted). Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted).

Additionally,

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants

- 6 -

termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* (internal citations omitted). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P., supra* at 1121.

Instantly, the court heard from several witnesses about Father's conduct. Mother testified that Father did not provide any assistance with Child, and Maternal Grandmother "did everything." (N.T. Hearing, 9/27/19, at 127). On one occasion, Father put Child "outside in the middle of the wintertime in his car seat and told [Mother] to take him and [Father] went in the house and closed the door." (*Id.* at 99). Father also abused Mother, which ultimately led to his arrest. (*Id.* at 106-11). After Mother relinquished custody, Father did not contact Mother to ask about Child. (*Id.* at 114).

Maternal Grandmother corroborated Mother's testimony. Maternal

Grandmother confirmed that Father left Child in a car seat, in the middle of the street, after a visit. (*Id.* at 162-63). Father called Maternal Grandmother from prison and asked about Mother, but not about Child. (*Id.* at 165). Father did not contact Maternal Grandmother to give gifts or money to Child, but he did ask her to testify "on his behalf" at the termination hearing. (*Id.* at 156, 170-71).

Appellee J.A.C. testified that she received five letters from Father while he was incarcerated. (*Id.* at 310). One letter mentioned the possibility of Appellees bringing Child to visit Father at the prison, but Father did not follow up on this idea. (*Id.*) Although J.A.C. received phone calls from Father inquiring about Child generally, she also received calls where Father requested money without ever asking about Child. (*Id.* at 263). Father did not offer to provide financial support, and Father did not send birthday or holiday gifts and cards to Child. (*Id.* at 257, 272-78).

Upon his release from prison in March 2018, Father showed up unannounced at Appellees' home and wanted to see Child. (*Id.* at 264). Instead of consenting to the unannounced visit, J.A.C. arranged a scheduled visit for later that week. (*Id.* at 265). However, Father canceled the visit at the last minute. (*Id.* at 266). A few months later, J.A.C. received text messages from Father that she perceived as threatening. (*Id.* at 268). Consequently, J.A.C. stopped answering Father's texts and calls, and he ceased his attempts at communication. (*Id.* at 269-70).

Father testified that he had primary custody of Child until the time of his arrest. (*See* N.T. Hearing, 11/13/19, at 94). Father denied abusing Mother or leaving Child unattended. (*Id.* at 83-84). Father claimed that he sent over twenty-five letters to Child from prison. (*Id.* at 96). Father also insisted that he sent several consent forms to Appellees to facilitate a visit at the prison, but Appellees refused to execute the forms. (*Id.* at 97). Father admitted he went to Appellees' home, but this occurred only after J.A.C. refused to respond to other forms of communication. (*Id.* at 101). Father also reiterated his wish to parent: "I've always been a part of my child's life, and I've done everything to provide for him as I possibly have been able to do. I'm the only one that has done so." (*Id.* at 119).

On this record, the trial court correctly determined that Father refused to perform his parental rights for a period of at least six months prior to the filing of the termination petition. *See In re I.J., supra*. Father has not seen Child since March 2016, except for a brief moment when he appeared at Appellees' home. (*See* N.T. Hearing, 11/13/19, at 264). Further, the court credited the testimony from Appellees' witnesses, which outlined Father's disinterest in parenting. The court did not credit Father's exaggerated claims of involvement in Child's life, and it is not our role to reweigh this determination. *See In re Z.P., supra*. Under the totality of these circumstances, the evidence warranted involuntary termination under Section

2511(a)(1).[2]  ***See In re B., N.M, supra.***

The record also supports the court's conclusions regarding Section 2511(b).  Kate Adams, an expert in the performance of home studies and post-placement supervisory visits, testified that Child has bonded with Appellees.  (***See*** N.T. Hearing, 9/27/19, at 230-31).  Ms. Adams reported Child was comfortable with Appellees, and Appellees attended to Child's needs.  (***Id.*** at 209-10).  Ms. Adams indicated Appellees "love [Child] as if he is their biological son," and it would be detrimental to Child to remove him from Appellees' home.  (***Id.*** at 210, 231).  In contrast, Father conceded "[i]t's highly unlikely" that he shares a bond with Child.  (N.T. Hearing, 11/13/19, at 265).

Here, terminating Father's parental rights would not destroy an existing, necessary, and beneficial relationship for Child.  ***See In re Z.P., supra***.  Based upon the foregoing, the record supports the court's conclusion regarding termination of Father's parental rights under Sections 2511(a)(1) and (b).  ***Id.***  Consequently, we affirm the decree terminating Father's parental rights to Child.

Decree affirmed.

_____

[2] Although Father compares Appellees' behavior to the conduct at issue in ***Adoption of M.S.***, that case is distinguishable.  There, despite the foster parents' obstructive behavior, the mother sent gifts to the child through the mail. ***See Adoption of M.S., supra*** at 1373.  This Court determined the gifts evidenced the mother's continued interest in parenting despite obstacles placed in her way. ***See id.***  Here, Father displayed no comparable behavior.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 8/26/2020*