J-A23034-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: P.W.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.B.A., MOTHER | : | |
| | : | No. 531 WDA 2025 |

Appeal from the Order Dated April 1, 2025
In the Court of Common Pleas of Blair County
Orphans' Court at No. 2024 AD 20A

| | | |
|---|---|---|
| IN THE INTEREST OF: P.J.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.B.A. MOTHER | : | |
| | : | No. 532 WDA 2025 |

Appeal from the Order Dated April 1, 2025
In the Court of Common Pleas of Blair County
Orphans' Court at No. 2024 AD 20

BEFORE: PANELLA, P.J.E., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED: October 22, 2025**

A.B.A. (Mother) appeals from the denial of her request to terminate the parental rights of T.H.S. (Father) to the parties' two biological children, P.J.S. and P.W.S. (collectively, Children). We affirm.

Case History

Mother and Father were never married. When they became involved in 2012, Mother had a one-year-old son (P.X.) from a prior relationship. N.T.,

10/31/24, at 153. Mother, Father, and P.X. were living together in August 2013 when P.J.S. was born. N.T., 9/6/24, at 5. In the fall of 2014, Mother and Father separated. *Id.* Mother was pregnant with P.W.S., who was born in July 2015. *Id.*

Mother subsequently obtained a protection from abuse (PFA) order against Father which "allowed Father visitations supervised by Father's mother." Orphans' Court Opinion (OCO), 4/1/25, at 3. However, Mother "had the PFA order removed because the situation became more stable." *Id.* The stability was short-lived, but "neither party has ever filed a custody action." *Id.* at 8. The orphans' court explained:

> Beginning in 2015, several dark factors were affecting Father. His relationship with Mother was toxic. He was … using drugs. He was doing nothing to take care of his mental health. He had been diagnosed and medicated as bi-polar, which he believes now was a mis-diagnosis. His younger brother, with whom he was very close, was diagnosed with childhood cancer and ultimately passed away. [P.X.], whom Father considered his child, although not his [biological child], was involved in [a] serious accident which permanently disabled that child.
>
> ***
>
> By 2016, Father had come to the conclusion that Mother would not allow him to see Children on Father's terms; rather, he would have to see [Children as] a "package deal." Moreover, Mother would require his visits to be supervised and Mother would be heavily involved and "calling the shots." Mother did not allow anyone to drive Children except for herself and her parents. At that point, Father "blew up" and accused Mother of using the kids as pawns.

*Id.* at 3-4. Father "stopped the visitations because, although he wanted to see [C]hildren, he did not want to see Mother who was omni-present." *Id.* at 3.

Also in 2016, Father became involved with S.S. (Stepmother). N.T., 10/31/24, at 74. Father and Stepmother were married in 2019 and have two children together. *Id.* at 40. Around the same time, Mother began a relationship with B.A. (Stepfather), whom she married in 2022. N.T., 9/6/24, at 36. Mother and Stepfather have one child together. *Id.*

After 2016, Father did not see Children for approximately five years, and "neither party filed any action to establish custody." OCO at 4. As a result, Children did not know that Father was their biological father.

In 2021, Stepmother and Mother "began to communicate and had some visits among themselves and Children." *Id.* at 5. However,

Father was not permitted to attend visits between Mother, [Stepmother], and their respective children. Mother did not trust Father in light of his past behavior and wanted to take things slow. The visits seemed to be well-received by Children. Father was finally permitted to see [C]hildren at DelGrosso's Park in August, 2022. There was appropriate communication between Father and Children at DelGrosso's under the circumstances[, because Children did not remember or realize that Father was their biological father]. Later that year, the parties got together at Legion Park and P.J.S. was enthusiastic and wanted to go to the store from Legion Park with Father and [Stepmother], but Mother did not permit that.

Thereafter, Mother cooled to the idea of more visits among the families. Mother sought to "pump the brakes" due to Mother's concerns about telling Children that Father was their biological father and the potential emotional effect on them.

- 3 -

On June 9, 2022, Father messaged Mother [about] her intent to pursue adoption[, and sought] post-adoption contact which Mother rejected [on the basis] that he was, by then, essentially a stranger to Children.

Mother was concerned that such news and [Father's] additional continued involvement would be de-stabilizing or confusing to the Children. As such, Mother failed to respond to the entreaties of Father and [Stepmother,] which frustrated Father and [Stepmother].

[Later in 2022,] Father, through [Stepmother], attempted further communications by sending Christmas gifts to the Children, which Mother frowned upon. Efforts of [Stepmother] to get together at Christmas did not come to fruition.

*Id.* at 5-6.

Father was "still trying to find a time in January to get together to exchange gifts." N.T., 10/31/24, at 193. The efforts were unsuccessful, and on February 28, 2023, Father sent Mother "a message out of frustration because [he and Mother] were just getting nowhere." *Id.* at 192. Father's message "attacked Mother, … while at the same time acknowledging his past abandonment of Children and attempting to explain it in terms of his addiction and loss of his brother." OCO at 6. Mother did not respond, although the message prompted her to tell Children that Father was their biological father. *Id.* P.J.S. was "dismissive of the news," while P.W.S. had "no real recollection of Father." *Id.* Father's message to Mother "terminate[d] the relationship between [Father], [M]other, [Stepfather], and [S]tepmother." N.T., 10/31/24, at 213.

On June 11, 2024, Mother petitioned to terminate Father's parental rights at separate dockets for each child. Mother sought termination "to

- 4 -

permit [Stepfather] to adopt" Children. *See* Petitions to Involuntarily Terminate Parental Rights, 6/11/24, at 2 (stating that Mother and Stepfather had filed adoption petitions).

The orphans' court held termination hearings on September 6, 2024, and October 31, 2024. The court heard testimony from Mother, Paternal Grandmother, Stepmother, Stepfather and Father. The court also heard from Children's court-appointed counsel,[1] who advocated for termination.[2] On November 20, 2024, the court interviewed Children *in camera*. On December 17, 2024, the court granted the parties' joint request to file post-hearing briefs within 30 days of receiving the outstanding hearing transcript.[3]

On April 1, 2025, the orphans' court issued an order and opinion denying Mother's request to terminate Father's parental rights. The court concluded that the evidence did "not clearly warrant" termination, and that Mother had failed to prove grounds for termination under 23 Pa.C.S. § 2511(a)(1) and (2). OCO at 21.

---

[1] The orphans' court found that Children's counsel could represent Children's best and legal interests. *See* OCO at 2, 14; *In re Adoption of K.M.G.*, 240 A.3d 1218, 1224 (Pa. 2020) (stating that counsel may represent both interests "so long as the child's legal interests do not conflict with the attorney's view of the child's best interests").

[2] Although the orphans' court appointed counsel to represent Children's best interests, counsel is not a judicial or quasi-judicial officer, and the orphans' court is not bound by her recommendation. *See C.W. v. K.A.W.*, 774 A.2d 745, 749 (Pa. Super. 2001). It is the sole function of the orphans' court "to interpret the law, determine the facts[,] and apply the facts to the law." *Id.*

[3] The transcript was filed on March 19, 2025.

On April 29, 2025, Mother filed separate notices of appeal and Pa.R.A.P. 1925 concise statements at each docket.[4]  Mother presents the following question for review:

> Whether or not the [orphans'] court erred in denying Mother's request to terminate Father's parental rights pursuant to Section 2511(a)(1)?

Mother's Brief at 4.

## Discussion

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the order is supported by competent evidence.  *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021).  We must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record.  *Id.*  Where the factual findings are supported by evidence, we may not disturb the order unless we discern an error of law or an abuse of discretion.  *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).  An appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will."  *Id.* (citations omitted).  We will not re-weigh evidence, and we may not reverse a decision "merely because the record could support a different result."  *In re Adoption of K.M.G.*, 219 A.3d 662, 670 (Pa. Super. 2019) (*en banc*).

---

[4] This Court consolidated the appeals *sua sponte* on May 20, 2025.

The termination of parental rights is governed by Section 2511 of the Adoption Act. *See* 23 Pa.C.S. § 2511. "Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). Here, the orphans' court found that Mother failed to prove grounds for termination under Section 2511(a)(1) and (2). Mother does not dispute the court's finding regarding Section 2511(a)(2), but challenges its finding as to Section 2511(a)(1).[5]

Section 2511(a)(1) permits termination "upon establishing parental abandonment." *In re Adoption of L.A.K.*, 265 A.3d at 583 (citation omitted). Section 2511(a)(1) provides for termination when:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1). Pertinently, a "wealth of Superior Court jurisprudence instructs [orphans'] courts deciding Subsection 2511(a)(1) cases to consider the whole history of a given case and 'not mechanically apply

---

[5] Because the court found that Mother failed to prove grounds for termination under 23 Pa.C.S. § 2511(a), it declined to analyze Children's needs and welfare under Section 2511(b). OCO at 22; *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (noting that the analysis of a child's needs and welfare under Section 2511(b) occurs after the statutory requirements of Section 2511(a) have been met).

the six-month statutory provision[,]' although 'it is the six months immediately preceding the filing of the petition that is most critical to the analysis.'" *In re Adoption of C.M.*, 255 A.3d at 364 (citations omitted).

In addition, a parent's failure or refusal to perform parental duties must be analyzed in relation to the particular circumstances of the case. *In re Adoption of L.A.K.*, 265 A.3d at 592. A parent's efforts "are always considered 'in light of existing circumstances.'" *Id.* (citations omitted). The "focus of the inquiry is whether, under the circumstances, the parent has acted with reasonable firmness in refusing to yield to the obstacles that have prevented the performance of parental duties." *Id.* at 592–93 (citations omitted). The Supreme Court has instructed:

> [E]ven where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months as required by Section 2511(a)(1), the court "must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights]." Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b). We reiterate that the purpose of this analysis is to give effect to our mandate that courts avoid a mechanical application of the law regarding the termination of parental rights. The law must be applied with the purpose of serving [the] needs and welfare of each individual child in his or her particular circumstances. It is within this framework that a court determines whether a parent has faced barriers that prevented the parent from maintaining the parent-child relationship. What constitutes a "barrier" in the context of a Section 2511(a)(1) analysis is a finding within the

discretion of the trial court, and what may constitute a barrier necessarily will vary with the circumstances of each case. In some instances, obstructive behavior by the child's custodian presents a barrier to the parent's ability to perform parental duties, which mitigates the parent's failure to maintain the parent-child relationship. In other instances, trial courts have found substance abuse, mental health issues, homelessness, joblessness, criminal charges, or a confluence of some or all of these issues created barriers to the maintenance of the parent-child relationship. In all instances, the trial court considered the explanation offered by the parent when deciding whether termination of parental rights was warranted.

*Id.* at 593 (citations omitted).

Mother argues that the orphans' court "erred in finding that the efforts of Father, primarily through [Stepmother], to maintain contact with [C]hildren through Mother[,] established the requisite fortitude necessary to defeat [Mother]." Mother's Brief at 10. Mother emphasizes that Children "do not know Father and did not recognize their Father in 2022 during the two short, attempted visits." *Id.* at 12. According to Mother, the court "erred by not giving the time period of 2023 to [the] filing [for] termination in June of 2024 appropriate consideration." *Id.* at 30. Mother asks, "At what point does Father get to stop blaming Mother and take responsibility for his decision not to be a parent [in C]hildren's lives?" *Id.* at 24. The crux of Mother's argument is that the orphans' court "misse[d] the significance of th[e] evidence." *Id.*

Children's counsel also argues that the orphans' court erred in declining to terminate Father's parental rights. Counsel cites evidence which is favorable to termination in concluding that "Father offered no reasonable

explanation for his failure; instead blaming his lack of interest in Children on the fact that he and Mother did not get along." Counsel's Brief at 5.

Father counters that the orphans' court did not err, and properly denied termination based on evidence that "Mother's actions constitute[d] a demonstrated design to deter Father from establishing [a] relationship and performing parental duties as to [C]hildren." Father's Brief at 6. We agree that the orphans' court did not err.

The orphans' court's decision should not be reversed "merely because the record would support a different result." *In re E.J.C.*, 335 A.3d 1222, 1229 (Pa. Super. 2025) (citation omitted). This Court has "previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings." *Id.* The orphans' court has the discretion to determine what "constitutes a 'barrier' [to parenting] in the context of [] Section 2511(a)(1)." *In re Adoption of L.A.K.*, 265 A.3d at 593. "In some instances, obstructive behavior by the child's custodian presents a barrier to the parent's ability to perform parental duties, which mitigates the parent's failure to maintain the parent-child relationship." *Id.* Also, substance abuse, mental health issues, "or a confluence" of issues may create barriers "to the maintenance of the parent-child relationship." *Id.*

The orphans' court recognized that Mother filed the termination petition on June 11, 2024, "making the period from December 11, 2023 through June 11, 2024 the presumptively relevant time period." OCO at 16. Thus, the

- 10 -

court found that the evidence "clearly and convincingly established that Father failed to perform affirmative parental duties for a period in excess of six months as required by Section 2511(a)(1)." *Id.* However, the court acknowledged that it was required to avoid "the mechanical application of the 6-month rule." *Id.* at 17. The court stated:

> As such, we must determine whether Father's circumstances and explanation for his failures are sufficient to preclude the termination of his parental rights. The focus of our inquiry is whether Father has acted with reasonable firmness in refusing to yield to the obstacles that have prevented the performance of parental duties. The [c]ourt finds that the evidence does not clearly and convincingly demonstrate that Father has failed to act with reasonable firmness in attempting to maintain a relationship with Children.

*Id.* at 16.

Citing legal authority and the record, the orphans' court determined that Mother failed to prove grounds for termination under Section 2511(a)(1). *See Id.* at 9-11, 16-21. The court described Mother's "demonstrated design to deter Father from establishing a relationship and performing parental duties." *Id.* at 19. For example:

> Mother insisted that Children not receive gifts from Father and [Stepmother,] and Mother went so far as to get a P.O. Box so as to avoid the risk of Children seeing that packages were from Father. Before refusing Father to see Children at all, Mother would only allow Father to see Children if he also saw all the children — meaning … Children and Mother's other children — as a "package deal." Moreover, Mother would require his visits to be supervised and Mother would be heavily involved and "calling the shots." Mother did not allow anyone to drive Children except for herself and her parents. Mother ignored [Stepmother's] requests for visits. Indeed, it appears to the [c]ourt that it was, as [Paternal Grandmother] claimed, Mother's "way or the highway."

Under these circumstances, Father's failure to seek custody rights through the [c]ourts based on his apprehension that litigation would further exacerbate the ill feelings between him and Mother are understandable. The decision to attempt to work out issues without resorting to the [c]ourts should not be punished. In any event, "'a mere showing that the parent could conceivably have pursued legal action more promptly cannot justify termination of parental rights.'" *Adoption of M.S.*, … 664 A.2d 1370, 1374 ([Pa. Super.] 1995) (quotation omitted).

*Id.* at 19-20.

The orphans' court recognized that often Stepmother, "as opposed to Father himself, undertook most of the efforts to reunite the parties." *Id.* at 20. The court found that Stepmother acted "for and on behalf of Father who reasonably believed that [Stepmother] taking the laboring oar would have a better chance of success." *Id.* The court did "not criticize Mother's instincts … whether borne out of a desire to protect Children or out of over-protectiveness," but stressed that the court's focus was "not on Mother's motivations, but on the fact that she decided for whatever reasons, to essentially remove Father from the lives of Children by refusing to allow them to spend time with Father." *Id.* In considering the effect of termination on Children, the court stated:

[W]e accept Father's testimony as credible in that he has more recently … taken tangible steps to overcome [his mental health and substance abuse issues, and] has made significant progress and plans to continue to better himself. Only time will tell on that score, but we do not foreclose the opportunity for him to be a father to the Children based on this record.

*Id.* at 21.

- 12 -

The evidence supports the orphans' court's findings. For example, Stepmother testified that initially, Father contacted Mother repeatedly in an attempt to see Children. Stepmother relayed that in 2016,

> [Father] had been texting [Mother] trying to figure out a schedule to see [Children], like when [Mother] would allow it, and she said that she didn't want to bring the kids around until she had met me. So then I started texting her to try to coordinate a date when we could get together.

N.T., 10/31/24, at 43-44. Stepmother stated that she and Father continued "reaching out trying to make attempts to get with [Mother], meet [Children], come up with a structured schedule and consistency with [Children,] but that [was] not happening because of [Mother's] excuses." *Id.* at 44. She also testified that the effort "was put on hold because it was getting nowhere." *Id.* at 45-46, 76.

Father testified that by 2021, Stepmother would contact Mother because he "feared that if it was just me that reached out, she would just ignore it." *Id.* at 185. Father stated that he "always wanted a relationship with [Children]." *Id.* at 184. However, at one point, Father had supported Stepfather's adoption of Children. He changed his mind when he realized that adoption could result in him being foreclosed from having any contact with Children. Father explained:

> [Stepfather] is a great person. Every time I have ever talked to him the guy has got a positive attitude. He just seems genuine, and when I met him, I'm like this guy should be their dad. [H]e has stepped up, he has been there. I don't have a problem with that whatsoever. So when [Mother and Stepfather] asked about [adoption initially], I was all for it…. My dad adopted me. It was

- 13 -

a great thing. I am for that. My concern was that it was shutting the door on me. I didn't want to lose [Children] forever, and I knew that if I gave [Mother] permission and all control that I was never going to see them again.

*Id.* at 191. Father added:

I feel like this is my last chance to show [Children] that I care. I am not here to take [Children] away. I just want to see them. I just want to be a part of their life. … I know if I sign my rights away, I am giving all of that up. I am not willing to do that.

*Id.* at 197.

Based on the evidence, the orphans' court concluded that termination could not be "predicated on conduct which is reasonably explained." OCO at 21. The court noted that Father knew that sending the February 23, 2023 message to Mother "was wrong[, but] that he sent it out of a sense of frustration from Mother 'ghosting' him and [Stepmother]." *Id.* at 6. The court also observed:

Mother was simply not interested in proceeding with developing a relationship. [Stepfather] confirmed that Mother intentionally ignored [Stepmother]. Although Mother testified that she is poor at responding promptly to messages, it is clear to the [c]ourt that she also did not want the relationship between Father and the Children to take hold.

*Id.*

The record supports the orphans' court's determination that Father had not evidenced a settled purpose of relinquishing claim to Children, and under the particular circumstances of this case, Mother's actions created a barrier which "mitigate[d Father's] failure to maintain the parent-child relationship." *In re Adoption of L.A.K.*, 265 A.3d at 593. Therefore, the orphans' court

did not err or abuse its discretion in finding that Mother failed to prove grounds for termination under Section 2511(a)(1).

Orders affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

10/22/2025