J-S03001-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF M.H., A/K/A M.G.H.., A MINOR CHILD | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: K.W., MOTHER | : | |
| | : | No. 1202 WDA 2021 |

Appeal from the Decree Entered September 15, 2021
In the Court of Common Pleas of Armstrong County Orphans' Court at
No(s):  Case No. 3 or 2021

BEFORE:   LAZARUS, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY LAZARUS, J.:            **FILED:    APRIL 20, 2022**

K.W. (Mother) appeals from the final decree, entered in the Orphans' Court of Armstrong County, terminating her parental rights[1] to M.H. (born 9/2010), pursuant to 23 Pa.C.S.A. §§ 2511(a)(8), and (b) of the Adoption Act.[2]   After our review, we affirm based on the opinion authored by the Honorable Chase G. McClister.

Armstrong County Children, Youth and Family Services (CYF) became involved with Mother in September 2017 due to unsafe and substandard home conditions.   CYF provided in-home services, but despite sporadic

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] On August 27, 2021, M.H.'s Father filed a petition to voluntarily relinquish his parental rights to M.H.  The court entered a decree terminating Father's parental rights that same day. He is not involved in this appeal.

[2] 23 Pa.C.S.A. §§ 2101-2938.

improvement, the housing situation deteriorated. In July 2018, CYF visited the home and noted deplorable conditions: excessive garbage, clutter, and animal feces throughout the house, particularly in M.H.'s bedroom. In September 2018, M.H. was adjudicated dependent, and she remained in Mother's custody under protective supervision. Home conditions continued to deteriorate. In the spring of 2019, CYF received reports that the conditions in Mother's home worsened, and she was keeping multiple animals, including up to 40 cats and a pig, in the home. CYF filed an application for protective custody, which the court granted on July 17, 2019. M.H. was removed from the home. At that time, CYF had growing concerns about Mother's mental health issues. M.H. was placed in foster care.[3] The court held permanency review hearings in January, June, September, and December of 2020. After each hearing the court found Mother had made minimal progress toward alleviating the conditions in the home that led to placement. After the December 2020 hearing, the court changed the permanency goal from return to home to adoption.

Approximately eighteen months later, on January 27, 2021, CYF filed a petition to terminate Mother's parental rights under sections 2511(a)(1), (a)(5), and (a)(8) of the Adoption Act. The court scheduled a hearing and,

---

[3] In April 2021, M.H. was placed with a different foster family; she remains with them to date as her pre-adoptive family.

over objections by both the guardian *ad litem*[4] and CYF, the court granted

Mother three continuances. The court ultimately held a termination hearing

on August 27, 2021, after which the court entered a decree terminating

Mother's parental rights to M.H.

Mother filed a timely appeal. She raises the following issues for our

review:

1. Did the trial court err in granting the petition for involuntary termination of parental rights of Mother under 23 Pa.C.S.A. § 2511(a)(8)?

2. Did the trial court err in granting the petition for involuntary termination of parental rights of Mother under 23 Pa.C.S.A. § 2511(a)(1)?

3. Did the trial court err in granting the petition for involuntary termination of parental rights of Mother under 23 Pa.C.S.A. § 2511(a)(5)?

4. Did the trial court err in granting the petition for involuntary termination of parental rights of Mother under 23 Pa.C.S.A. § 2511(b)?

Appellant's Brief, at 8.[5]

_____

[4] The court appointed Paula C. LaStrapes, Esquire, as guardian *ad litem,* who reported to the court that there was no conflict between M.H.'s legal interests and best interests. *See In re Adoption of K.M.G.*, 240 A.3d 1218 (Pa. 2020).

[5] Because we affirm the trial court's determination under section 2511(a)(8), we need not address issues two and three. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc ) (this Court may affirm trial court's decision regarding termination of parental rights with regard to any one subsection of section 2511(a), along with consideration of section 2511(b)). We note the trial court need only determine CYF met its burden under one subsection of

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. . . . [O]ur standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As [the Supreme Court] discussed in *In re: R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review in these cases. [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead[,] we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826–27 (Pa. 2012) (some citations omitted).

---

section 2511(a); Mother's claims with respect to subsections (a)(1) and (a)(5) are superfluous.

CYF, as petitioner, has the burden to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). "[T]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation and quotation marks omitted).

Here, the trial court terminated Mother's parental rights under sections 2511(a)(8) and (b).[6] A party seeking termination under section 2511(a)(8)

_____

[6] **§ 2511. Grounds for involuntary termination**

> (a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * *
>
> (b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. **With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall**

must prove the following by clear and convincing evidence: "(1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2012) (citation omitted). "Termination under section 2511(a)(8) does not require the court to evaluate a parent's **current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services**." *Id.* (citation omitted) (emphasis added).

Mother argues that CYF failed to meet the requirements of subsection 2511(a)(8) by clear and convincing evidence because CYF "failed to show that the conditions which led to the removal  or placement of [M.H.] continue to exist[.]" Appellant's Brief, at 14.  However, even though Mother acquired a new housing situation in March 2020, she did not do so until two months after the petition for termination was filed.  *See* Trial Court Opinion, 10/25/21, at

---

**not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.**

23 Pa.C.S.A. §§ 2511(a)(8), (b) (emphasis added).

17.[7] The trial court is prohibited by statute from considering Mother's efforts after CYF filed the petition for termination. *See* 23 Pa.C.S.A. § 2511(b).

The trial court set forth in its opinion its reasons for determining that CYF presented clear and convincing evidence that termination of Mother's parental rights was proper under sections 2511(a)(8) and (b). *See* Trial Court Opinion, *supra* at 15-17 (stating M.H. has been in placement for more than 12 months; as of time of filing of termination petition, conditions that lead to placement continued to exist—indeed, were much worse; M.H.'s issues, including several chronic respiratory problems, low weight, behavioral difficulties, and truancy, "have resolved since [M.H.] has been placed with her pre-adoptive family[,]" and therefore termination would best serve M.H.s needs and welfare).

Additionally, the court set forth in its opinion its reasons for determining that CYF presented clear and convincing evidence that termination of Mother's parental rights was in M.H.'s best interests under section 2511(b). *See* Trial Court Opinion, supra at 18-19 (although there is bond between Mother and M.H., it "is clear that the bond has deteriorated over the past year" and that M.H. believes Mother prioritizes her animals over her, and relationship "appears to be moving from familiar and relatively comfortable to somewhat

---

[7] The court did, however, take judicial notice of the fact that Mother was charged on March 23, 2021, with 198 counts of animal-related crimes, including aggravated cruelty to animals, neglect, and cruelty. *See* Trial Court Opinion, *supra* at 7. The disturbing recitation from the prosecuting humane officer is set forth in full in the trial court's opinion. *Id.* at 7-8. Bail conditions preclude Mother from having any animals in her new residence.

hostile and tense. Severing such a bond will not work a significant detriment to [M.H.], who now looks to her pre-adoptive family for emotional, physical and financial support.").

The record supports the trial court's findings, and the court's conclusions are not the result of an error of law or an abuse of discretion. ***See In re Adoption of S.P.***, 47 A.3d at 826–27. Accordingly, we affirm the termination decree based on the trial court's opinion. The parties are directed to attach a copy of that opinion in the event of further proceedings.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/20/2022

Circulated 03/29/2022 02:36 PM

IN THE COURT OF COMMON PLEAS, ARMSTRONG COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

FILED
09/15/2021 11:13:58 AM
REGISTER AND RECORDER
ARMSTRONG COUNTY
PENNSYLVANIA
Inst Num:          202110832

IN RE: ADOPTION OF M.H., a/k/a  :
M.G.H.  :   No. 3 of 2021
  :

## FINDINGS AND MEMORANDUM

## IN THE COURT OF COMMON PLEAS, ARMSTRONG COUNTY, PENNSYLVANIA
### ORPHANS' COURT DIVISION

IN RE: ADOPTION OF M.H., a/k/a    :
M.G.H.                             :      No. 3 of 2021
                                        :

## FINDINGS AND MEMORANDUM

McClister, J.

Before the Court for disposition is the Petition to Determine Involuntary Termination of Parental Rights filed by Armstrong County Children, Youth and Family Services ("CYF"). The petition regards the subject minor child, Maddison H████, a/k/a Maddison-G███ H████ (DOB: 9/██/10) (the "Child" or "M.G.H.") and her biological mother, K███ W███ ("Mother" or "K.W."). The petition does not concern M.G.H.'s biological father, V███ H████, a/k/a V███ E██ H████, ("Father" or "V.H.") (together with Mother, "Parents").[1] CYF seeks termination of Mother's parental rights under subsections 2511(a)(1), 2511(a)(5), and 2511(a)(8) of the Pennsylvania Adoption Act, 23 Pa. Cons. Stat. Ann. § 2101 *et seq.* (the "Adoption Act"). The Court held a hearing on the petition on August 30, 2021, and it is now ripe for decision.

### I.     PROCEDURAL HISTORY

CYF filed its termination petition on January 27, 2021, approximately 18 months after M.G.H first was placed into foster care, 27 months after she first was

---

[1] Although CYF originally sought involuntary termination of both Father's and Mother's parental rights, Father subsequently petitioned on August 27, 2021, to voluntarily relinquish his parental rights. The Court entered a decree granting Father's petition the same day.

adjudicated dependent, and 41 months after CYF first because involved to address the conditions of Mother's residence. Hearing on the petition first was scheduled for March 18, 2021. On that date, Mother appeared with her counsel requesting a continuance because she had secured new housing. Over the objection of both CYF and the guardian *ad litem*, the Court granted the continuance and rescheduled the hearing for April 19, 2021. Mother thereafter secured new counsel, who requested a second continuance on April 15, 2021. Again over the objection of CYF and the guardian *ad litem*, the Court granted the continuance and rescheduled the hearing for June 21, 2021. The Court continued the hearing a third and final time on June 21, 2021, due to court time constraints.

## II.   FINDINGS OF FACT[2]

1.      M.G.H. was born on September 🞄, 2010. CYF first became involved with M.G.H. in the fall of 2017, although it had on occasion received referrals concerning M.G.H. in prior years.[3] In 2017, CYF received reports that the condition of Mother's residence was substandard. Upon inspecting Mother's residence, CYF concluded that it met, barely, minimum safety standards. CYF thereafter facilitated in-home services for Mother to help her clean and organize.

---

[2] Without objection from the parties, the Court takes judicial notice of the record from the associated child dependency case, No. CP-03-DP-0000050-2018, including the findings and permanency review orders entered by this Court.

[3] Although Father at one time had some partial custody of M.G.H. and initially was having visits after her placement, he did not participate to any significant degree in the permanency plan developed by CYF and eventually stopped having any visits with M.G.H. Because Father has voluntarily relinquished his parental rights, the Court will limit its factual findings and analysis to Mother and her relationship with M.G.H.

2

2.    Mother initially was fairly cooperative with CYF, who sent a caseworker to inspect Mother's residence on a monthly basis. During the next several months, although Mother indicated that she was working on improving the conditions of the house, the conditions continued to worsen. CYF observed considerable amounts of animal feces throughout the home, on the Child's belongings, and under her bed.

3.    CYF also addressed M.G.H.'s truancy during this period. She had been enrolled in school in the Redbank Valley School District, but Mother later enrolled her in cyber school. She nevertheless remained habitually truant.

4.    In July 2018, CYF visited the home and noted that conditions were deplorable. CYF took photographs that day that clearly show excessive garbage, clutter, and animal feces throughout the house, particularly in the Child's bedroom. Mother's relationship with CYF became more adversarial at the time of this visit and has continued to be very adversarial to date.

5.    In September 2018, Mother prevented CYF from entering her home to check the condition of the residence, insisting that the residence was clean and free of safety hazards. CYF soon thereafter filed a dependency petition seeking protective supervision.

6.    The Court granted the petition and awarded CYF protective supervision on November 9, 2018.

7.    During the following several months, the conditions of Mother's home improved to some degree and she began counseling. At times, however, Mother

3

would only clean certain portions of the residence and not permit the inspecting caseworker into other areas of the house.

8. After February 2019, CYF received reports that the conditions of Mother's home worsened and that she was keeping multiple animals, including up to 40 cats and a pig, in her residence. CYF thereafter filed an application for protective custody, which the Court granted on July 17, 2019. M.G.H. was placed in kinship care with a family friend.[4]

9. As part of the initial service plan, Mother was required to address the conditions of her residence and obtain mental health treatment. The initial permanency goal was for M.G.H. to return to home with Mother.

10. As evidenced by the several permanency review orders entered at the dependency case, Mother at no time after placement complied substantially with the permanency plan. Mother did not allow anyone from CYF into her home after July 2019, and her relationship with CYF continued to deteriorate. Mother continued to engage in counseling, but she at no point adequately addressed the mental health issues contributing to the condition of her home.

11. To aid with Mother's attempts to clean and organize her residence, CYF offered at the October 2019 permanency hearing to pay for a dumpster to allow Mother to dispose of the large amounts of refuse. CYF agreed to provide the dumpster only if Mother agreed to CYF's inspection of her home after the dumpster

---

[4] In April 2021, M.G.H. was placed with a different foster family, J███ and D███ S███████. She remains with them to date as her pre-adoptive family.

4

was removed. Mother would not agree to the inspection, and therefore CYF did not provide the dumpster.

12. In late 2019 and continuing through 2020, Mother became even more combative and adversarial with CYF and refused to have any in-person visits with her caseworker, Kylie Simmons, who had been involved with Mother since 2017.

13. Sometime prior to April 2020, Mother blocked Simmons' cellular telephone number, precluding any communication by phone call or text message. After several unsuccessful attempts to get in contact with Mother, Simmons contacted Mother by letter to advise her that the agency would be forced to communicate by regular mail if Mother did not permit mobile phone contact.

14. In March and June 2020, Mother underwent a psychological and parental capacity evaluation by Dr. Martin Meyer, Ph.D. Dr. Meyer concluded that Mother was in virtually complete denial of her emotion-based psychological difficulties and of the unsafe conditions of her home. He further indicated that her parenting capacity would most likely be otherwise adequate if it were not for her ongoing minimization of her problems and refusal to take any responsibility for them.

15. CYF continued to attempt to get in contact with Mother to inspect the conditions of her home, but Mother did would not permit it. CYF sent another letter requesting an inspection in September 2020, just prior to the next regularly-scheduled permanency hearing.

5

16. At certain points after the CYF placed M.G.H., Mother made some attempt to secure alternative housing. In October 2019, her aunt and uncle offered her a mobile home that they owned, but CYF did not approve the home as suitable for the Child. Mother testified that she again attempted in 2020 to secure alternative housing, but she never notified CYF or the permanency court of these attempts until after the termination petition was filed.

17. As of the December 2020 permanency hearing, given that the Child had been in placement for more than 15 months and Mother continued to achieve only minimal compliance with the permanency plan, CYF changed the primary permanency goal to adoption rather than return home.

18. Mother testified that she moved out of her former residence sometime in February 2021. It is unclear where she resided immediately after she left the residence. She further testified that, when she left, the condition of the home was "decent."

19. In March 2021, Mother's friends, the S████████ purchased a home in New Bethlehem, Pennsylvania and told Mother that she could live there. The house is actually titled in the name of Mrs. S██████ mother. Although a rental agreement was discussed, Mother and the owner never executed a written rental agreement. Mother pays no rent, but instead indicated that she is remodeling the house in lieu of rent.

20. Mother began moving into her current residence sometime on or about March 17, 2021, the day prior to the date originally scheduled for the termination

6

hearing. On March 18, 2021, when Mother and her counsel requested a continuance of the hearing because of Mother's new residence, Mother testified that she would not have any animals in her new residence and that her "nephew is taking responsibility in my old home. I have rehomed most of my animals. The ones that are left he will be taking responsibility of those." (N.T., 3/18/21, at 6:15-18).

21. The Court takes judicial notice of the fact that, on March 23, 2021, Mother was charged with 198 total counts of animal-related crimes, including aggravated cruelty to animals,[5] neglect,[6] and cruelty.[7] After preliminary hearing, all counts were held over to the Court of Common Pleas.

22. The Court further takes judicial notice of the following allegations, as recited by the prosecuting humane officer, that form the basis of the criminal charges against Mother:

> [On March 22, 2021), I searched the parameter [sic] and discovered 5 deceased birds located in cages at the back of the house. We observed no water or food in the pens but a large amount of feces.
>
> Upon entering the home we discovered 7 deceased dogs, 5 deceased rabbies [sic], and 3 deceased felines. 2 of the deceased dogs were found in one crate. Skeletal remains of 1 dog found in the hallway had been eaten by the other animals inside the house. 1 dog was found deceased on a chair. 2 cats were found deceased in the basement lying together with mold growing on the bodies. 3 deceased rabbits were found in a tote on the kitchen counter. One kitten was decomposing in the hallway on top of a black box. Overflowing litter boxes were also observed throughout the

---

[5] 18 Pa. Cons. Stat. Ann. § 5534(a)(2).

[6] 18 Pa. Cons. Stat. Ann. §§ 5532(a)(2), (a)(3).

[7] 18 Pa. Cons. Stat. Ann. § 5533(a).

7

structure. There was also a large amount of trash and feces throughout the house, along with a foul smell of decay. Mobility was difficult due to the extreme amount of trash throughout the house. Some of the animals appeared to be recently deceased, others hand been dead for some time. We observed no water or food available for any of the animals, however, unopened wet dog food was located in the kitchen. We saw cats and three dogs that were still alive. Both dogs have very low body score. One dog was weak and had difficulty walking. The other dog had numerous sores on his body. Numerous cats and two dogs were transported to rescue. Several cats and one small dog, along with the carcasses of the deceased animals are still at the home.[8]

23. As a condition of her bail, Mother is not permitted to have any animals in her new residence. The residence appears to be clean and suitable. Her nephew, who is pictured sleeping on the couch in one of the photographs introduced by Mother, is living at the residence rent-free. He never moved into Mother's prior residence.

24. When M.G.H. was removed from Mother's home, she suffered from numerous breathing issues and contracted frequent upper respiratory infections. She also required dental work, was very thin, and frequently acted in an animalistic manner when stressed. Her health issues have significantly improved or resolved altogether since being in foster care with her pre-adoptive family. Her behavior also has improved and she is doing very well in school, which she attends in person. Her hygiene also has improved, and she is growing rapidly.

---

[8] Affidavit of Probable Cause, No. MJ-33304-CR-0000040-2021; No. CP-03-CR-0000561-2021. The Court does not take make any findings about the accuracy of the humane officer's allegations or whether such allegations, if proven, would constitute any of the crimes with which Mother is charged. The Court takes judicial notice only of the fact of the filing of the charges and the underlying allegations lodged by the Commonwealth.

8

25. M.G.H. has a close bond with her current pre-adoptive family, to whom she goes for support. She is very familiar and comfortable with them, and they make her well-being a top priority. M.G.H. also spends significant time with her pre-adoptive grandparents.

26. M.G.H. continues to have in-person visits with Mother two times per week. The visits were virtual for a period in 2020 during the COVID-19 pandemic.

27. Although Mother believes that the visits go well, and M.G.H. indicated her strong desire in 2020 to return to Mother's residence, the Court finds that circumstances have changed considerably. Mother at times is habitually late for visits, and she has slept during some of them. Both of these circumstances upset M.H.G., who no longer desires to return to Mother's residence. When asked what she thought of that possibility, M.G.H. indicated that if she returned home, Mother would care more for the animals than she would about her.

28. Mother and M.G.H.'s visits have at times become physical, which Mother describes as "rough-housing." The Court does not find such physicality, in this context, to be normal or healthy. Rather, it likely is due to growing tension and frustration from M.G.H. about Mother's failure to make any real progress.

29. Mother and M.G.H. continue to have some bond, but there is no evidence that the bond is strong or one that is advantageous to M.G.H.'s well-being.

## III.   DISCUSSION

### A.   Applicable Legal Standards

CYF has standing to file a petition to involuntarily terminate Mother's parental rights because it is an approved agency with legal custody of M.H.G. *See* 23 Pa. Cons. Stat. Ann. §§ 2102, 2512(a)(2).  In making its determination, the Court conducts a bifurcated analysis.  The Court first must determine whether grounds for termination exist under 23 Pa. Cons. Stat. Ann. § 2511(a).  If such grounds do exist, the Court then must determine, under 23 Pa. Cons. Stat. Ann. § 2511(b), whether termination will be serve the needs and welfare of the child.

CYF asserts grounds to terminate the parental rights of Mother and Father under sections 2511(a)(1), (a)(5), and (a)(8) of the Adoption Act, which provide as follows:

(a)      General rule.— The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)      The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

(5)      The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance

10

reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8)     The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa. Cons. Stat. Ann. §§ 2511. The burden is on the party seeking termination to prove the existence of grounds by clear and convincing evidence. *In re Julissa O.*, 746 A.2d 1137, 1140 (Pa. Super. Ct. 2000). Clear and convincing evidence is evidence "so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts at issue." *Id.* (quotations and citations omitted).

Under section 2511(a), the Court may terminate parental rights based on a finding of a settled purpose to relinquish parental claim *or* a finding that the parent has refused or failed to perform parental duties for at least the six months prior to the filing of the termination petition. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. Ct. 2010)(citation omitted). To establish a settled purpose to relinquish a parental claim, the person seeking to terminate parental rights must show that the parent made a deliberate decision to terminate the parent-child relationship throughout the statutory six-month period. *Adoption of M.S.*, 664 A.2d 1370, 1373 (Pa. Super.

11

Ct. 1995). Failure to maintain contact, in and of itself, will not automatically result

in the termination of parental rights under this subsection. *Id.*

With regard to a failure or refusal to perform parental duties, the

Pennsylvania Supreme Court long ago described the parental duty to care for a

child:

> A child needs love, protection, guidance and support. These needs,
> physical and emotional, cannot be met by a merely passive interest in
> the development of the child. . . . [T]he parental duty is a positive duty
> which requires affirmative performance. This affirmative duty
> encompasses more than a financial obligation; it requires continuing
> interest in the child and a genuine effort to maintain communication
> and association with the child. Because a child needs more than a
> benefactor, parental duty requires that a parent exert himself to take
> and maintain a place of importance in the child's life.

*In re Burns*, 379 A.2d 535, 540 (Pa. 1977) (internal citations and quotations

omitted).[9] Further,

> Parental duty requires that the parent act affirmatively with good
> faith interest and effort, and not yield to every problem, in order to
> maintain the parent-child relationship to the best of his . . . ability,
> even in difficult circumstances. A parent must utilize all available
> resources to preserve the parental relationship, and must exercise
> reasonable firmness in resisting obstacles placed in the path of
> maintaining the parent-child relationship. Parental rights are not
> preserved by waiting for a more suitable or convenient time to
> perform one's parental responsibilities while others provide the
> child with [the child's] physical and emotional needs.
>
> . . .
>
> To be legally significant, the [post-abandonment] contact must be
> steady and consistent over a period of time, contribute to the

---

[9] In determining whether grounds for termination exist under section 2511(a)(1), the Court considers the entire background of the case and does not mechanically apply the six-month statutory provision. Instead, the Court examines all circumstances and explanations of the parent to determine if the evidence clearly warrants the involuntary termination. *In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. Ct. 2004) (citation omitted).

12

psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d at 1119 (internal citations and quotations omitted).

With respect to a petition filed pursuant to section 2511(a), the Court may not consider "any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa. Cons. Stat. Ann. § 2511(b).

Under section 2511(a)(5), the Court determines whether CYF has proven the following: 1) the subject child has been removed from parental care for at least six months, 2) the conditions which led to removal or placement continue to exist, 3) the parent cannot or will not remedy the conditions that led to placement within a reasonable period of time, 4) the services or assistance reasonably available to the parent are unlikely to remedy the conditions that led to removal, and 5) termination of parental rights will serve the needs and welfare of the children. 23 Pa. Cons. Stat. Ann. § 2511(a)(5); *In re Adoption of M.E.P.*, 825 A.2d 1266, 1273-74 (Pa. Super. Ct. 2003).

Under subsection 2511(a)(8), parental rights may be terminated where "[t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the

13

needs and welfare of the child." 23 Pa. Cons. Stat. Ann. § 2511(a)(8).[10] The

Superior Court of Pennsylvania has further summarized the elements of section

2511(a)(8) as follows:

> Section (a)(8) sets a 12-month time frame for a parent to remedy
> the conditions that led to the children's removal by the court. Once
> the 12-month period has been established, the court must next
> determine whether the conditions that led to the child[ren]'s
> removal continue to exist, despite the reasonable good faith efforts
> of DHS supplied over a realistic time period. Termination under
> Section 2511(a)(8) does not require the court to evaluate a parent's
> current willingness or ability to remedy the conditions that initially
> caused placement or the availability or efficacy of DHS services

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. Ct. 2008).[11]

If the Court concludes that grounds for termination have been established

pursuant to section 2511(a), the Court then must consider the "developmental,

physical and emotional needs and welfare of the child." 23 Pa. Cons. Stat. Ann. §

2511(b). This involves consideration of

> the tangible dimension, as well as the intangible dimension, of the
> needs and welfare of a child, such as the love, comfort, security, and
> closeness, all of which are part of a parent-child relationship.
> Continuity of relationships is also important to a child. In
> considering what situation would best serve the child's needs and
> welfare, the court must examine the status of the bond between the
> natural parent and the child to consider whether terminating the

---

[10] This language, when parsed, includes three distinct elements: 1) the child has been removed from parental care for 12 months or more from the date of removal; 2) the conditions which led to the removal or placement of the child continue to exist; and 3) termination of parental rights would best serve the needs and welfare of the child. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa. Super Ct. 2003).

[11] The third requirement of subsection 2511(a)(8), that termination of parental rights would best serve the needs and welfare of the child, is textually distinct from the requirements of subsection 2511(b). Despite their similarities, however, the Court is to conduct separate analyses. Under subsection 2511(a)(8), the court considers the needs and welfare of the child together with the conduct of the parent. *See In re C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. Ct. 2008) (*en banc*). *But see In re M.A.B.*, 166 A.3d 434, 448 (Pa. Super. Ct. 2017).

14

natural parents' rights would destroy an existing, necessary and beneficial relationship.

*In re Adoption of TBB*, 835 A.2d 387, 395 (Pa. Super. Ct. 2003) (citations omitted).

Unlike the Court's analysis under section 2511(a), which is focused on the parent,

the focus under section 2511(b) is on the child. *In re Adoption of C.L.G.*, 956 A.2d

999, 1008 (Pa. Super. Ct. 2008). Although relevant, "[a] parent's own feelings of

love and affection for a child, alone, do not prevent termination of parental rights."

*In re L.M.*, 923 A.2d 505, 512 (Pa. Super. Ct. 2007). Further,

> Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

*In re Adoption of C.J.P.*, 114 A.3d 1046, 1054 (Pa. Super. Ct. 2015) (internal

citations and quotations omitted). *See also In re Z.P.*, 994 A.2d 1108, 1121 (Pa.

Super. Ct. 2010) (in performing the § 2511(b) bonding analysis, the court "is not

required to use expert testimony. Social workers and caseworkers can offer

evaluations as well. Additionally, Section 2511(b) does not require a formal bonding

evaluation.") (internal citations omitted).

    B.    <u>Analysis</u>

    a.    <u>Grounds for Termination Under Section 2511(a)(8)</u>

15

Because the Court finds that grounds for termination of Mother's parental rights exist under subsection 2511(a)(8), it need not address the alternate grounds asserted by CYF.

It is clear and undisputed that M.G.H. has been in placement for more than 12 months. It also does not appear to be seriously disputed that, as of the time of the filing of the termination petition, the conditions that lead to placement continued to exist—indeed, were much worse. As of January 2021, after more than three years of involvement with CYF and 18 months of the M.G.H.'s placement, Mother had not taken any significant steps toward improving the condition of her residence. Instead, Mother only at times, and after direct prompting, made some temporary improvements. Mother soon cut off contact with CYF and never permitted them to inspect her residence after placement. Mother further remained in complete denial of her situation and would not accept any responsibility for it, instead projecting blame onto CYF, her family and friends, and anyone else but herself. That attitude, together with Mother's irrational and self-delusional denial of the conditions of her prior residence, continues to date.

Mother and her counsel stressed at the termination hearing that Mother made certain attempts to secure alternative housing after placement. She was not successful, and her efforts in no way improved the conditions of her residence, which continued to deteriorate for a period of almost two years. Moreover, even if Mother had secured new housing, that fact would not necessarily alleviate the problems that lead to placement. There is no evidence indicating that any of

16

Mother's residences would not eventually end up in the same condition as her prior residence. The only reason why Mother does not have animals in her current home is the bail condition precluding her from doing so. She has no ownership interest in her current residence, does not pay rent, and resides there with her 20-year-old nephew. Thus, even if the Court were required to consider the fact that Mother acquired new housing two months after the termination petition was filed, that fact would not in itself preclude a finding of clear and convincing evidence that the conditions leading to placement continue to exist.

Under the third prong of § 2511(a)(8), the Court considers whether termination of Mother's parental rights would best serve M.G.H.'s needs and welfare. The Court considers both Mother's and M.G.H.'s conduct in making this determination. When M.G.H. left Mother's residence, she suffered from several chronic respiratory problems, was at a very low weight, and had behavioral difficulties. She also was truant and not attending either in-person or online schooling. The Court is compelled by the evidence of record to conclude that these difficulties were caused by the deplorable and unsanitary condition of Mother's residence and Mother's lackadaisical approach to parenting. Further, all of these issues have resolved since M.G.H. has been placed with her pre-adoptive family.

Nor is there any substantial evidence that, if M.H.G. moved back into Mother's residence, she would be in a substantially different position than she was when she was placed. Although Mother very recently has obtained new housing and testified that she now has a better support system, her ongoing refusal to

17

recognize the mental health and behavioral problems that led to the deplorable conditions in her residence militates against any conclusion that she will be able to provide a residence suitable for M.G.H.'s needs and welfare. The Court therefore concludes that the third prong of subsection 2511(a)(8) has been satisfied by clear and convincing evidence.

b. Section 2511(b)

Having concluded that CYF has established grounds for termination under subsection 2511(a)(8), the Court now considers under subsection 2511(b) whether termination of Mother's parental rights would serve M.G.H.'s developmental, physical and emotional needs and welfare. Although CYF did not obtain an official bonding assessment, the Court nevertheless heard ample testimony from which to conclude that severing whatever bond remains between Mother and M.G.H. will not destroy an existing, necessary, and beneficial relationship. Although there appears to be a familiar bond remaining between Mother and M.G.H., it also is clear that the bond has deteriorated over the past year. Although Mother continues to have visits, M.G.H. now separates easily from her and has been disappointed on numerous occasions because of Mother's tardiness in showing up for visits. M.G.H. also has explained that Mother prioritizes her animals over M.G.H., and the visits between the two have gotten physically aggressive more than once. This likely has occurred because of conflict engendered by Mother's unwillingness to improve her situation. Thus, the relationship between Mother and M.G.H. appears to be moving from familiar and relatively comfortable to somewhat hostile and tense. Severing

18

such a bond will not work a significant detriment to the M.G.H., who now looks to her pre-adoptive family for emotional, physical, and financial support.

Given the significant strides the M.G.H. has made in her physical health, hygiene, schooling, and behavior since being removed from Mother's care, the Court is constrained to conclude that there is clear and convincing evidence that severing the bond that remains between her and Mother is in her best interest. Other than her own emotional appeal, Mother has not offered any evidence to the contrary.

## IV.   CONCLUSIONS OF LAW

1.   CYF has proven by clear and convincing evidence grounds for termination of Mother's parental rights under 23 Pa. Cons. Stat. Ann. § 2511(a)(8).

2.   CYF has proven by clear and convincing evidence that termination of Mother's parental rights will serve the needs and welfare of M.G.H. under 23 Pa. Cons. Stat. Ann. § 2511(b).

An appropriate decree follows.

19